## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JEAN CARLOS RAMOS

CRIMINAL CASE NO.

1:11-cr-00060-TWT-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendant Jean Carlos Ramos ("Ramos") is charged in a third superseding indictment with one count of Hobbs Act conspiracy to commit robberies, two counts of attempted Hobbs Act robberies that occurred on or about April 3, 2009, and April 7, 2009, two counts of knowingly using and carrying a firearm in furtherance of said attempted robberies, two counts of attempted possession with intent to distribute cocaine, and one count of attempted possession with intent to distribute methamphetamine, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(ii)-(iii), and 1951(a), and 21 U.S.C. §§ 841(b)(1)(B)-(C) and 846. [Doc. 174].[1]  Ramos has filed a motion to dismiss the indictment, alleging a violation of his Sixth Amendment right to a speedy trial, [Doc. 529], as amended, [Doc. 541], which the government opposes, [Doc. 550].  Ramos has filed a reply, [Doc. 551], and for the

_____

[1] The listed document and page numbers in citations to the record in this Report, Recommendation, and Order refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

reasons that follow, it is **RECOMMENDED** that Ramos' motion to dismiss the indictment, [Doc. 529], as amended, [Doc. 541], be **DENIED**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On February 16, 2011, a grand jury in the Northern District of Georgia returned an indictment against Ramos and five co-defendants based on their alleged participation in home invasions that were occurring against drug trafficking organizations, including two attempted robberies that occurred on or about April 3, 2009, and April 7, 2009, [Doc. 1]; see also (Tr. at 7, 43).[2]   The indictment detailed Ramos' alleged participation in planning "to commit by force, violence, fear, and injury, armed robberies of illegal drugs and monetary proceeds from drug trafficking held in the possession of individuals whom defendants believed were engaged in the illicit drug trade." [Doc. 1 at 2-3 ¶ 1].  The indictment was superseded on October 11, 2011, [Doc. 75], and again on January 10, 2012, [Doc. 110].   A third superseding indictment was returned against Ramos and others on February 7, 2012, [Doc 174], charging Ramos with one count of Hobbs Act conspiracy to commit robberies, two counts of attempted Hobbs Act robberies

---

[2] See [Doc. 539] for the transcript of the evidentiary hearing held on November 29, 2022.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at __)."  The parties also submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. __)" for the government's exhibits and "(Def. Ex. __)" for Ramos' exhibit.

that occurred on or about April 3, 2009, and April 7, 2009, two counts of knowingly using and carrying a firearm in furtherance of said attempted robberies, two counts of attempted possession with intent to distribute cocaine, and one count of attempted possession with intent to distribute methamphetamine, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(ii)-(iii), and 1951(a), and 21 U.S.C. §§ 841(b)(1)(B)-(C) and 846, [id.].

The original indictment was sealed because some of the defendants, including Ramos, were not in custody at the time the indictment was returned. (Tr. at 7, 44). After the indictment was unsealed, the arrest warrant for Ramos was entered into the National Crime Information Center ("NCIC") on March 2, 2011, by Special Agent Buddy Early ("Agent Early") of the Federal Bureau of Investigation ("FBI"), who was the case agent between 2011 and 2019 and remained involved in the case after 2019. (Tr. at 6-8, 11, 44).[3] Agent Early and Special Agent Chris Owen ("Agent Owen") of the Department of Homeland Security, Immigration, and Customs Enforcement, another case agent, began talking with codefendants who were in custody and other cooperating individuals

---

[3] Agent Early testified that after he entered Ramos' name into NCIC, "routine validations" were required to be performed by NCIC, and Agent Early completed subsequent NCIC validations on July 27, 2012, August 9, 2013, August 19, 2014, February 8, 2016, December 22, 2016, May 29, 2018, July 31, 2019, June 23, 2021, and September 2, 2021. (Tr. at 11-14); see also (Gov. Exs. 1-9).

3

and learned that Ramos may have fled to the Dominican Republic.  (Tr. at 9, 20, 32-33, 43, 45).[4]  The agents' sources later indicated that Ramos may have gone to Mexico or Europe, but agents were never able to substantiate that information. (Tr. at 20-21, 36, 67, 72-73).

On February 27, 2012, a "Red Notice" was issued, which Agent Early testified was "a document the United States or other countries can put out with partner countries or cooperating countries to let them know that we're interested or we may be obtaining an arrest warrant in the United States for a particular individual."  (Tr. at 9-12, 48).  Agent Early testified that he was unsure why it took a year for the Red Notice to be issued.  (Tr. at 57).  However, even though the Red Notice had been issued, no arrest of Ramos could be made outside the United States without a provisional arrest warrant, which could not be obtained until the extradition package was approved by the United States and accepted by the Dominican Republic.  (Tr. at 10, 64); see also [Doc. 550 at 4].

In attempting to locate Ramos, Agent Early and other agents contacted "cooperating defendants and witnesses out in the community," conducted a

---

[4] Ramos is a native of the Dominican Republic and holds dual citizenship in the Dominican Republic and the United States.  (Tr. at 14, 16, 31, 44).

"logical investigation,"[5] and "made contact with [the FBI] Santo Domingo legal attaché" to inform him that Ramos may be in the Dominican Republic. (Tr. at 15). Although the legal attaché "start[ed] conducting a logical investigation into his whereabouts[, ] at that time [they] didn't have extradition paperwork," so there was not a way to bring Ramos back to the United States if he had been found. (Tr. at 15-16). Agent Early testified that he spoke to the legal attaché "[p]robably at least on an annual basis[.]" (Tr. at 15, 41). Additionally, agents "put up posts around the border with the NCIC to look at border lookouts to see if he came back." (Tr. at 36-37). Agent Owen also checked Ramos' flight history and determined that Ramos last entered the United States in 2005, but there was no record of a subsequent lawful departure from the United States. (Tr. at 37, 45-47, 53; Gov. Ex. 10). Agent Owen testified that he checked inbound and outbound flights using Ramos' name and date of birth, so if Ramos had entered or departed the United States using a Dominican Republic passport, he would have known. (Tr. at 53). Agent Early testified that members of the organization under investigation "commonly used different identification to get in and out [of the

---

[5] Agent Early testified that a "logical investigation" meant speaking to confidential informants, law enforcement authorities, and other people. (Tr. at 26).

country], so [they] logically assumed that [] he . . . got out without using the proper IDs." (Tr. at 37).

The government encountered two obstacles in obtaining an extradition package for Ramos. (Tr. at 4, 16, 35). First, from at least the time of the offenses in 2009, until approximately April 2016, the Dominican Republic refused to accept an extradition package that had a warrant signed by the Clerk of Court instead of a judge, as was the case with the arrest warrant for Ramos. (Tr. at 4, 25, 35). Second, Ramos did not have a cedula, which caused an issue with approval of the extradition package from around April 2016 until July 2019.[6] (Tr. at 16, 35, 65). The State Department engaged in negotiations with the Dominican Republic regarding both of these issues. (Tr. at 23, 35, 39). Following these negotiations, the extradition package ultimately was approved by the State Department on May 7, 2019, without a cedula. (Tr. at 17, 23, 35, 39, 63, 70).[7]

---

[6] Deputy United States Marshal John Palmer ("Deputy Palmer") testified that a cedula is an identification number issued to residents of the Dominican Republic. (Tr. at 62-65).

[7] Agent Early testified that while the State Department was negotiating with the Dominican Republic, the FBI never stopped trying to find Ramos, that they "constantly worked on it," even if it was "not something [they] worked on every single day," as they had "all these measures in place," including that they had their sources out, talked to law enforcement, had the NCIC up, and "maintained regular contact with the folks [they] had here locally that had at least ties to the Dominican

6

Agent Early testified that he reached out to the U.S. Marshals Service on August 26, 2019, to request assistance in finding Ramos. (Tr. at 17, 63).[8] Deputy Palmer testified that Ramos' extradition package did not include a cedula, which made it difficult to locate Ramos. (Tr. at 65-66).[9] On July 30, 2019, the provisional arrest warrant was delivered to the Dominican Republic. (Tr. at 18).[10] In April of 2021, codefendant Roberto Rosario ("Rosario"), who had been arrested in the Dominican Republic in August 2019, informed agents that Ramos was in hiding in Santo Domingo, that Ramos knew he had an arrest warrant and avoided electronics and stayed inside of his apartment, only coming out at night. (Tr. at

_____

Republic . . . and others giving [them] information," and if Ramos had "come back into the United States, [they] would have gotten those alerts." (Tr. at 39-40).

[8] Deputy Palmer testified that the "team in the Dominican Republic was working on the case for two years, and they did all their normal stuff[:] They ran him through facial recognition, and they did interviews with sources and all the normal stuff we do for fugitive cases." (Tr. at 62, 66). Deputy Palmer further testified that "[t]hey were working on it the whole time." (Tr. at 67).

[9] Agent Early and Deputy Palmer both testified that, to their knowledge, a cedula for Ramos was never located. (Tr. at 16, 33, 36, 65).

[10] Agent Early testified that between the time the provisional arrest warrant was issued and the time Ramos was arrested, he and Agent Owen made contact with their sources on "a monthly basis." (Tr. at 22). Agent Early testified that they performed "logical investigation," worked "with [FBI's] legal attaché partners," and talked "to folks here in the United States" about where Ramos was, and they "kind of [started] picking up the pace trying to look for him" after they had the provisional arrest warrant. (Tr. at 19-20).

21, 49-50).  Rosario identified a neighborhood area of Santo Domingo where he believed Ramos was residing.  (Tr. at 50-51).  Agents subsequently arrested Ramos in Santo Domingo on August 18, 2021.  (Tr. at 19, 49).

As previously noted, Ramos is a dual citizen of the United States and the Dominican Republic, (Tr. at 14, 16, 31, 44), but agents were unaware that Ramos possessed a Dominican Republic passport, (Tr. at 36, 53).  Agents did not learn about his Dominican Republic passport until after 2019 when the extradition package was delivered.  (Tr. at 33).  Ramos has several family members who are United States citizens or reside in the United States, including his mother, father, two brothers, two children, and a sister-in-law.  (Tr. at 57-58, 68).  However, agents never spoke to any of Ramos' family members during the time they were searching for him, (Tr. at 30, 57-58, 67), even after learning that Ramos' mother and brother traveled to the Dominican Republic, (Tr. at 73, 68), because agents believed it was "not always helpful to talk to the family members of people who are fugitives," as "they don't tell you the truth a lot of times," (Tr. at 67-68); see also (Tr. at 60).  After he was assigned to the case in 2019, Deputy Palmer suggested subpoenaing the phone records for Ramos' mother and brother, but the subpoena was never sought, and he was not sure why, as the records might have been helpful in locating Ramos.  (Tr. at 71-72).  Deputy Palmer, however, did not consider

8

subpoenaing the credit card or bank records of Ramos' family members. (Tr. at 74). Deputy Palmer also testified that he was not given a copy of Ramos' alien file, but he acknowledged that any addresses where Ramos had previously lived in the Dominican Republic might have been helpful to his investigation. (Id.).

At the evidentiary hearing held on November 29, 2022, Ramos' counsel proffered that Ramos moved back to the Dominican Republic in May 2009 and executed a lease agreement in August 2009 in his name in Santo Domingo using his Dominican Republic passport. (Tr. at 78); see also (Def. Ex. 1). Ramos' counsel also proffered that in 2010, Ramos moved back to his grandparents' home in the village of Miches, where he had lived as a child, and he remained there for the next ten years. (Tr. at 77-79). Ramos' counsel further proffered that Ramos' mother believed that the grandparents' house was the address she would have put on the application for Ramos to come to the United States as a minor. (Tr. at 77). In 2019, Ramos moved back to Santo Domingo and applied for a cedula, but his application was not approved. (Tr. at 79). He remained in Santo Domingo until 2021, where he was arrested under his legal name. (Id.).

## II.   DISCUSSION

Ramos moves to dismiss the indictment due to the lengthy delay between the February 2011 indictment and his August 2021 arrest, which he asserts violates

9

his right to a speedy trial pursuant to the Sixth Amendment of the United States Constitution.  See [Doc. 541].  In response, the government contends that it exercised reasonable diligence in locating and arresting Ramos, that any delay is attributable to Ramos, and that Ramos cannot show actual prejudice.  [Doc. 550 at 13-21].

"The federal constitution guarantees the right to a speedy trial."  United States v. Treisback, Criminal Action No. 2:12–CR–00026–RWS, 2014 WL 2003031, at *4 (N.D. Ga. May 14, 2014) (citation and internal marks omitted), adopted at *1. "Sixth Amendment speedy trial rights attach at the time of arrest or indictment, whichever comes first, and continue until the date of trial."  Id. (citation and internal marks omitted).  "A defendant's Sixth Amendment right to a speedy trial cannot be quantified into a specific number of days or months," but "must be evaluated under the particular circumstances of each case using a balancing test which weighs the conduct of both the government and the defendant."  United States v. Spaulding, 322 F. App'x 942, 945 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted).

The Supreme Court has established four factors to be considered in deciding whether a defendant's constitutional right to a speedy trial has been violated: "(1) whether the delay before trial was uncommonly long; (2) whether the government

10

or the defendant is more to blame for that delay; (3) whether, in due course, the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered prejudice as a result of the delay." United States v. Duke, Criminal Action No. 4:11–CR–004–HLM–WEJ, 2011 WL 1811439, at *2 (N.D. Ga. Apr. 27, 2011) (footnote and citation omitted) (citing Barker v. Wingo, 407 U.S. 514, 530 (1972)), adopted by 2011 WL 1833213, at *5 (N.D. Ga. May 12, 2011); see also United States v. Lamar, 562 F. App'x 802, 805 (11th Cir. 2014) (per curiam) (unpublished) (citations omitted); United States v. Bibb, 194 F. App'x 619, 622 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted).  "When balancing the *Barker* factors, courts must articulate how heavily each factor weighs against the identified party." Duke, 2011 WL 1811439, at *3 (internal marks omitted) (quoting United States v. Ingram, 446 F.3d 1332, 1336 (11th Cir. 2006)).  And, "[i]n the Eleventh Circuit, a defendant generally must show actual prejudice unless the first three factors . . . all weigh heavily against the government." Id. (last alteration in original) (citations and internal marks omitted); see also Bibb, 194 F. App'x at 622 (citation omitted).

The government concedes that Ramos asserted his right to a speedy trial in a timely manner.  [Doc. 550 at 19].  Therefore, the third factor weighs in Ramos' favor.  However, the government maintains that the length of delay in light of

Ramos' "overseas flight and [] attempts to avoid detection leads at best to a draw regarding the first factor," [id. at 13], and that the second factor weighs in the government's favor because "the reasons for delay rest squarely on factors outside of the government's control," [id. at 14]. The government maintains that the fourth factor weighs in its favor because Ramos cannot show actual prejudice. [Id. at 19-20].

A.   **The Length of the Delay**

The first factor of the balancing test, the length of the delay, "serves as a double [i]nquiry" in that first, it is a "threshold inquiry that the defendant must satisfy in order for [the court] to weigh the remaining three factors," and second, the court must "examine[] the extent to which the delay stretches beyond the bare minimum needed to satisfy the threshold showing of presumptive prejudice." United States v. Villarreal, 613 F.3d 1344, 1350 (11th Cir. 2010) (citations and internal marks omitted). "The length of the delay itself weighs against the government, incrementally increasing in weight as the delay becomes increasingly protracted, and a particularly lengthy delay may also affect [the court's] analysis of the fourth [*Barker*] factor." Id. (citations omitted).

The length of the pretrial delay is determined by "caculat[ing] the time that elapsed between when the Sixth Amendment right attached until trial (or, until

the pretrial motion to dismiss on this ground is determined)."  Id. (citation and internal marks omitted).  "Here, [Ramos'] speedy trial right attached in [February 2011] when a federal grand jury indicted him."  Id.  Ramos was arrested in August 2021, (Tr. at 19, 49), over ten years after he was indicted, and "[d]elays exceeding one year are generally found to be presumptively prejudicial," United States v. Cadet, 521 F. Supp. 2d 1351, 1354 (S.D. Fla. 2007) (citations and internal marks omitted).  "The ten-year delay in this case clearly satisfies the threshold inquiry of presumptive prejudice."  Villarreal, 613 F.3d at 1350-51.  "The delay also extended significantly beyond the minimum necessary to show presumptive prejudice."  Id. at 1351 (citation omitted).  "This factor, therefore, weighs against the government." Id.

## B.   The Reason for the Delay

"The government bears the burden of explaining the reason for the delay." Spaulding, 322 F. App'x at 945 (citation omitted).  "Different reasons for delay are accorded different weight in the *Barker* analysis," and therefore, "the reasons for delay must be carefully analyzed to see who created the delay and whether that delay was an unacceptable manipulation or an acceptable incident of the criminal process."  United States v. Jones, No. 1:05-cr-617-WSD, 2007 WL 2071267, at *21 (N.D. Ga. July 19, 2007) (citations omitted), adopted at *3; see also United States v.

<u>Schlei</u>, 122 F.3d 944, 987 (11th Cir. 1997).   In analyzing the second factor, the Eleventh Circuit has noted that "[g]overnment actions that are tangential, frivolous, dilatory, or taken in bad faith weigh heavily in favor of a finding that a speedy trial violation occurred."[11]  <u>Bibb</u>, 194 F. App'x at 622 (alteration in original) (citation and internal marks omitted).   However, "delays that occur for valid reasons . . . will not be accorded heavy weight against the [g]overnment," and "negligence is a more neutral act that should not be weighed as heavily as bad faith."   <u>Id.</u> (citations and internal marks omitted).   That is, "[b]etween diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground," and "[a]lthough negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun."   <u>Doggett v. United States</u>, 505 U.S. 647, 656-57 (1992).[12]  "And such is the nature of the prejudice presumed

---

[11] "For example, the government may not deliberately delay a trial in order to weaken a defendant's case."  <u>Spaulding</u>, 322 F. App'x at 946 (citation omitted).

[12] "[N]egligence is still considered an 'unacceptable' reason for delay for which responsibility ultimately rests with the government," and the Court "become[s] less tolerant of delay caused by negligence the longer it lasts."  <u>United States v. Frederick</u>, 789 F. App'x 123, 128 (11th Cir. 2019) (per curiam) (unpublished) (citation omitted).

that the weight [the court] assign[s] to official negligence compounds over time as the presumption of evidentiary prejudice grows," and the "toleration of such negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial." Id. at 657 (internal citation omitted). However, "[t]o be sure, to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." Id.; see also United States v. Harris, 376 F.3d 1282, 1290 (11th Cir. 2004) (citation omitted) ("Nonetheless, the Supreme Court has recognized that a defendant generally cannot establish a Sixth Amendment speedy trial claim, however long the delay, if the government pursued the prosecution with 'reasonable diligence,' and the defendant fails to show that the delay resulted in 'specific prejudice to his defense.'").

Ramos argues that "there was no evidence that [ he] was aware of the investigation into him at the time he left the United States in May 2009," and "the FBI did not even begin its investigation until seven months after he left." [Doc. 541 at 13 (citation omitted)]. Ramos contends that even if he "learned at some point that he was wanted and chose not to volunteer his whereabouts, the government has not shown when that occurred and how much of the delay is arguably attributable to [ him]." [Id. at 14]. Ramos asserts that even if the "Court

finds credible the government's position that [ he] was a fugitive and contributed to the delay in locating him, the government still bears the burden of explaining that [ his] actions explain the *length* of the delay," and the government "must make a diligent, good-faith effort to find him and is not relieved of this duty just because [ Ramos] is in another country."  [Id. at 15 (citations and internal marks omitted)]. Ramos argues that "[t]he evidence in this case makes clear that the government did very little to locate [ him] or to move expeditiously to extradite, conducting a passive investigation and blaming the delays on hiccups in the extradition process."  [Id. at 16].  Ramos maintains that "[o]ther than doing a routine NCIC check (which is administratively required) and checking in sporadically with some contacts who had long proven themselves useless as sources of meaningful information about [ his] whereabouts, the government did virtually nothing from the time of indictment in February 2011 until his arrest in August 2021."  [Id.]. Ramos points to the government not interviewing anyone closely tied to him, not subpoenaing phone records or financial documents of family members, not asking a judge to sign the arrest warrant, and not providing information on the length of "negotiations" between the United States and the Dominican Republic.  [Id. at 16-17].  Ramos contends that "[i]t was not until a lead practically fell in the government's lap, through [a co-defendant's] arrest and cooperation, that the

government was able to find [him ]," and when he was arrested, "he consented to extradition and put up no resistance to being brought to this country."  [Id. at 17-18 (citation omitted)].

The government maintains that "the reasons for delay rest squarely on factors outside of the government's control," including "that Ramos fled the country to avoid arrest" and "that the country in which he was hiding refused to accept an extradition package and provisional arrest warrant for years because of a misunderstanding of the role of the Clerk of Court and negotiations between the governments as to whether a cedula was necessary."  [Doc. 550 at 14].  The government contends that "at no time from indictment to arrest did agents stop looking for Ramos," [id.], querying "sources throughout as to Ramos'[] possible whereabout[s] and routinely contact[ing] the legal attaché to keep the case fresh," while waiting for the provisional arrest warrant to be issued and the extradition package to be accepted, [id. at 16 (citation omitted)].  The government asserts that "after the provisional arrest warrant [was] issued, the United States Marshal[s] Service, [whose] search was frustrated by Ramos'[] lack of a cedula and travel documents, including a Dominican passport, went so far as to use facial recognition software without success to spot Ramos on the streets," in addition to querying "its own source to find Ramos."  [Id. (citation omitted)].  The government

17

contends that "agents also regularly validated his wanted status in NCIC."  [Id. at 17 (citations omitted)].

In his reply, Ramos contends that "the government's narrative omits key facts, fails to explain the agents' omissions, and ultimately cannot explain why it took so long to get to this point."  [Doc. 551 at 1].  Ramos asserts that "[t]he government completely ignores the single most important fact on which [ he] relies—the fact that he spent approximately a decade living in the same house he grew up in, and that would have been listed in his Alien File had the government bothered to look there," and "[t]he key to finding him was right under the government's nose, and it has no explanation for this blatant negligence."  [Id.].  Ramos points out that "the government offers no explanation for why it ignored the Deputy U.S. Marshal's suggestion that it subpoena telephone records for [] Ramos'[] family members[,]" and the government did not "adequately explain the agents' failure to contact any of [] Ramos'[] friends, family members, or close associates, choosing instead to rely for years on informants in its 'logical investigation' who had never provided the government with any meaningful lead."  [Id. at 2].

"A defendant has no duty to bring himself to trial; the [g]overnment has that duty[.]"  Ingram, 446 F.3d at 1337 (alteration, citation, and internal marks omitted).

"However, a defendant who intentionally evades the [g]overnment's efforts to bring him to trial is culpable in causing the delay." Id. (citations omitted); see also Villarreal, 613 F.3d at 1351 (citation omitted) ("A government's inability to arrest or try a defendant because of the defendant's own evasive tactics constitutes a valid reason for delay.").  Regardless, "the government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith." Villarreal, 613 F.3d at 1351 (citation omitted).  Additionally, "[w]here a defendant has lived in a foreign country for much of the period encompassing pretrial delay, reasonable diligence is often established through extradition." United States v. Resnik, No. 92–00394–CR, 2014 WL 1463469, at *3 (S.D. Fla. Apr. 14, 2014) (citations omitted).

Ramos bears at least some responsibility for the delay since he left the United States very shortly after the criminal conduct charged in the indictment occurred in 2009.  See (Tr. at 78); see also [Doc. 1].  While Ramos disputes the government's contention that he was a fugitive "actively elud[ing] law enforcement after his post-indictment flight to the Dominican Republic," [Doc. 550 at 13], the government presented evidence that multiple sources who were familiar with Ramos reported that he fled to the Dominican Republic after the crimes were committed and was evading detection, (Tr. at 9, 20, 32-33, 45), intel

19

that was eventually corroborated by codefendant Rosario in April 2021, when he informed agents that Ramos was in hiding in Santo Domingo, and that he knew he had an arrest warrant, and avoided use of electronics and stayed inside of his apartment, (Tr. at 7, 21, 49-51); see also Villarreal, 613 F.3d at 1353 (finding the defendant made "substantial efforts to evade police, [which ] partially explain[ed] the failure to arrest [him] earlier" where "agents received seemingly reliable information that [defendant] had fled to [] Mexico").

A fugitive is one who "intentionally avoids arrest by fleeing, hiding within, or remaining absent from the jurisdiction." Ener v. Martin, 987 F.3d 1328, 1332 (11th Cir. 2021) (citations omitted); see also Zhou v. U.S. Att'y Gen., 290 F. App'x 278, 280 (11th Cir. 2008) (per curiam) (unpublished) (alterations, citation, and internal marks omitted) (defining a fugitive as "a person who, having committed a crime, flees from the jurisdiction of the court where the crime was committed or departs from his usual place of abode and conceals himself within the district"); United States v. Grajales-Lemos, No. 94–621–CR, 2012 WL 1405712, at *4 (S.D. Fla. Mar. 27, 2012) (citation omitted) ("A person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges"), adopted by 2012 WL 1409678, at *1 (S.D. Fla. Apr. 23, 2012). "Mere absence from the jurisdiction in which a crime occurred does

20

not render the suspect a fugitive from justice; he must be found to have absented himself from the jurisdiction with the intent to avoid prosecution." <u>United States v. Pub. Warehousing Co.</u>, Criminal File No. 1:09–CR–490–TWT, 2011 WL 1126333, at *3 (N.D. Ga. Mar. 28, 2011) (citation and internal marks omitted).  Although Ramos was using his legal name when he was arrested in August 2021, (Tr. at 19, 49), and "consented to extradition and put up no resistance to being brought to" the United States, [Doc. 541 at 17 (citation omitted)], the evidence before the Court is that Ramos left the United States for the Dominican Republic shortly after the crimes alleged in the indictment were committed, leaving behind several close family members, but there is no record of a lawful departure from the country under his name, <u>see</u> (Gov. Ex. 10), and multiple sources informed the agents that Ramos fled the country to avoid arrest after the crimes were committed, and when Ramos was arrested, he was not living at his grandparents' home in Miches, but in Santo Domingo, where Rosario reported that Ramos was actively evading detection, <u>see</u> <u>Resnik</u>, 2014 WL 1463469, at *4 (inferring that defendant learned of his indictment years before he was arrested where he "did not return to the United States in the twenty-one years since his departure, even though his immediate family continued to live here").

21

"[T]he standard for determining whether the proffered reasons support the delay is not whether the government may have been able to do more," rather "the Court must analyze whether the [g]overnment engaged in 'continuous, good-faith efforts' to arrest [Ramos]." United States v. Hatum, Criminal Case No. 15-20189-CR-Scola, 2017 WL 3172824, at *6 (S.D. Fla. July 25, 2017) (citation and internal marks omitted). First, Ramos does not argue "that the government exercised bad faith in trying to find him," [Doc. 541 at 18], and "[t]here is no evidence that the delay was attributable to any bad faith on the part of the government," Frederick, 789 F. App'x at 129. Additionally, the record reflects that "[t]he [g]overnment's good-faith attempt to arrest [ Ramos] was diligent enough to avoid warranting the 'extraordinary remedy' of dismissing [his] indictment[]." United States v. Oliva, 909 F.3d 1292, 1306 (11th Cir. 2018) (per curiam) (citation omitted). The government pursued apprehending Ramos with reasonable diligence, including by promptly entering Ramos into the NCIC, obtaining a Red Notice, performing logical investigation in both the United States and the Dominican Republic, working with the legal attaché in the Dominican Republic, making contact with sources familiar with Ramos as well as cooperating defendants, and checking Ramos' flight records. (Tr. at 6-12, 15, 20, 32-33, 36-37, 41, 43-48, 53). "Contrary to [Ramos'] claim, these efforts were clearly more than minimal[.]" Frederick, 789 F.

22

App'x at 129 (internal marks omitted).  "In fact, it was through these efforts that [the government] eventually obtained the information that led to [Ramos'] arrest in [the Dominican Republic]."  Id.  Accordingly, "the [g]overnment presented ample evidence that it diligently sought [Ramos'] arrest after the indictment was returned and it made a reasoned decision to pursue extradition in [the Dominican Republic.]"  Hatum, 2017 WL 3172824, at *6.

As previously mentioned, the government contends it ran into two main obstacles in obtaining an extradition package for Ramos: the Dominican Republic's refusal to accept a warrant signed by the Clerk of Court instead of a judge, and Ramos' lack of a cedula.  (Tr. at 4, 16, 25, 35, 65).  The government offered no explanation for why it did not attempt to obtain an arrest warrant for Ramos signed by a judge, an option that the government had nearly five years to pursue during the time between 2011 and 2016 when the Dominican Republic would not accept the warrant signed by the Clerk of Court.  (Tr. at 26).  The government does not argue that the attempt would have been futile; in fact, the government does not address this argument at all.  See [Doc. 550].  However, obtaining an arrest warrant signed by a judge instead of the Clerk of Court would have been beyond the normal course of proceedings, and the government is "not required to exhaust

23

all conceivable avenues," <u>Spaulding</u>, 322 F. App'x at 946 (citation and internal marks omitted); only reasonable diligence is required.

Moreover, even if the government had obtained an arrest warrant for Ramos signed by a judge, a second factor delayed approval of the extradition package – Ramos did not have a cedula, a basic form of identification common to citizens of the Dominican Republic.  (Tr. at 16, 33, 35, 64-65, 70, 73).  The government was not responsible for the delay caused by Ramos' failure to have a cedula, and there was nothing the government could reasonably do to overcome this reason for the delay other than what it did, which was to continue to negotiate with the Dominican Republic to drop the cedula requirement, which the country ultimately did in 2019.  (Tr. at 17, 35, 39, 70).  The party most responsible for the delay based on this factor was Ramos, not the government.[13]

While the government made a diligent and good faith effort to locate Ramos in many respects, and Ramos contributed to the delay by fleeing to the Dominican

---

[13] Ramos' lack of a cedula also delayed his apprehension after the provisional arrest warrant was obtained, contributing to the delay between 2019 and 2021. Deputy Palmer testified that the "team in the Dominican Republic was working on the case for two years, and they did all their normal stuff[:] They ran him through facial recognition, and they did interviews with sources and all the normal stuff we do for fugitive cases."  (Tr. at 66).  Even with their efforts, they were not able to arrest Ramos until August 2021, a few months after Rosario provided the neighborhood area where Ramos could be found.  (Tr. at 19, 49-50).

Republic after the crimes occurred and by not having a cedula, Ramos has identified several deficiencies in the government's search for him.  See Villarreal, 613 F.3d at 1352-53 (noting "some concerns about gaps in the government's efforts to locate" the defendant where agent performed "ground-level investigations, . . . used databases to pursue [him]," like the NCIC and Auto Track databases which they checked annually, "placed a border patrol lookout," and received a tip from an informant that the defendant had fled to Mexico"); see also Resnik, 2014 WL 1463469, at *1, *4 (finding that despite deficiencies in the government's attempt to arrest the defendant, the defendant was "not blameless in causing his pretrial delay" where the defendant departed to Columbia "approximately six months before he was indicted, leaving behind his then-wife and young daughter").  First, the government provided no explanation for not reviewing Ramos' alien file, which his counsel proffered likely would have revealed the address of Ramos' childhood home, where he purportedly lived for ten years after his return to the Dominican Republic.  (Tr. at 31-32, 57, 74, 77-79); see also [Doc. 550].  Deputy Palmer testified that he "suppose[d]" any addresses in the alien file would have been helpful to his investigation into Ramos' whereabouts, but he was never given a copy of the alien file.  (Tr. at 74).  While Agent Owen speculated that he was "sure [he] did [look at the file] at the time," he could not recall one way or the other

as it had "been so many years," (Tr. at 57),[14] and nowhere in the government's response brief does it address Ramos' contention that he had "an alien file that would contain information about his original entry into the United States [ that] would have [had] an address listing where he was coming from." [Doc. 541 at 5 (citation omitted)].   However, by the time the government obtained the provisional arrest warrant and extradition package, Ramos was no longer living at his grandparents' residence in Miches, but in Santo Domingo. <u>See</u> (Tr. at 18-19, 71, 78-79).

The government also offers no explanation for why it was unable to determine that Ramos had a Dominican Republic passport, which he possessed at least in 2009 when he executed a lease agreement in his name in Santo Domingo. (Tr. at 33, 36, 53, 55-56, 75, 78; Def. Ex. 1).  It appears that in an attempt to figure out whether Ramos left the Dominican Republic for Mexico, Deputy Palmer contacted the investigator in the Dominican Republic, who said there were no "travel documents," but "she didn't use the word 'passport.'" (Tr. at 75).  Agent Early did not have an answer when asked if there was "any reason why [he] did

---

[14] While Agent Owen testified that he believed he had Ramos' fingerprints "due to the alien file," he did not indicate when he would have had access to the alien file.  (Tr. at 51).

not try to offer or obtain [Ramos'] Dominican Republic passport in lieu of a cedula[.]" (Tr. at 33).

The government argues that it chose not to contact Ramos' family members "for fear of tipping Ramos off and because family members often lie to law enforcement to aid the fugitive," [Doc. 550 at 3 (citation omitted)]; <u>see also</u> (Tr. at 30, 57-58, 60, 67-68), but fear of tipping off Ramos is inconsistent with the government's contention that Ramos already knew about the charges and that was the reason he was "hiding" in the Dominican Republic, <u>see</u> [Doc. 550]. Moreover, while the government generally asserts that "family members often lie," [<u>id.</u> at 3 (citation omitted)]; <u>see also</u> (Tr. at 68), it fails to explain why it did not employ other investigative techniques regarding Ramos' family that would not have required contacting them. Despite Ramos' mother, father, two brothers, two children, and sister-in-law lawfully residing in the United States, (Tr. at 57-58), and the government's knowledge that Ramos' mother and brother traveled to the Dominican Republic "during the time when Ramos was being sought," [Doc. 550 at 9 (citation omitted)]; (Tr. at 68), the government did not subpoena the phone records or financial statements of Ramos' mother and brother, something Deputy Palmer acknowledged could have been useful in locating Ramos, (Tr. at 71-72, 74).

27

While the government failed to explain why it took a year for the issuance of the Red Notice, and declined to address why it chose to wait five years for the Dominican Republic to approve the arrest warrant signed by the Clerk of Court rather than request a judge to sign the warrant; why it took another three years for the Dominican Republic to accept the extradition package without a cedula; why in the ten-year period between indictment and arrest, it did not review Ramos' alien file and visit the Miches address; why it was unable to locate Ramos' Dominican Republic passport; and why it never contacted Ramos' family members or subpoenaed their phone records or financial statements after his mother and brother visited the Dominican Republic, it remains the case that the government was "not required to exhaust all conceivable avenues," Spaulding, 322 F. App'x at 946 (citation and internal marks omitted), and the government's failures in this case are properly characterized as "no more than mere negligence," Frederick, 789 F. App'x at 130 (citation and internal marks omitted).  "Nor [is] it negligence that must be weighed heavily against the government, since . . . the government's negligence [is] only slight and [] it attempted to locate [Ramos] in good faith."  Id. (citation and internal marks omitted).  "[W]hile the government could have done more to apprehend [ Ramos]," United States v. James, 183 F. App'x 923, 927 (11th Cir. 2006) (per curiam) (unpublished), "the [g]overnment

28

presented ample evidence that it diligently sought [Ramos'] arrest after the indictment was returned[,]" Hatum, 2017 WL 3172824, at *6. "These efforts were carried out in good faith and with due diligence, and were all that was required of [the government.]" United States v. Machado, 886 F.3d 1070, 1081 (11th Cir. 2018) (footnote omitted); see also United States v. Cabral, 979 F.3d 150, 160-61 (2d Cir. 2020) (finding that while the law enforcement efforts taken to locate the defendant "were far from exhaustive," that "is not the legal test.").

Because the government was "not required to exhaust all conceivable avenues," Spaulding, 322 F. App'x at 946 (citation and internal marks omitted), and "because the government at a minimum acted in good faith, any alleged failure to more diligently pursue [Ramos] should not weigh heavily against the government," Machado, 886 F.3d at 1081 n.11 (citation omitted). "[T]hat the government sought [Ramos] with 'some diligence' and in good faith and that its negligence was 'slight' is amply supported by the record." Frederick, 789 F. App'x at 129 (citation omitted). Additionally, Ramos contributed to the delay by fleeing to the Dominican Republic shortly after the crimes occurred and by not having a cedula, both of which made it more difficult for the government to locate him and obtain his extradition. Accordingly, "the reasons for the delay in arresting [Ramos] do not weigh heavily against the [g]overnment." Hatum, 2017 WL

3172824, at *7; see also United States v. Knowles, 390 F. App'x 915, 929 (11th Cir.

2010) (per curiam) (unpublished) (footnote and citation omitted) (finding that

"although the post-indictment delay . . . was arguably attributable to the

government, [defendant] had presented no compelling evidence of bad faith on

the part of the government," and "[t]his factor therefore [did] not weigh heavily

against the government.").

C.   **Ramos' Assertion of his Right to a Speedy Trial**

"A defendant's assertion of his speedy trial right is often entitled to strong

evidentiary weight in determining whether a defendant is being deprived of the

right," because "a timely demand for a speedy trial often supports an inference

that the defendant was not at fault for the delay and that the delay prejudiced the

defendant." Villarreal, 613 F.3d at 1353-54 (citation and internal marks omitted).

However, his "failure to make a demand can hardly be counted against the

defendant during those periods when he was unaware that charges had been

lodged against him." Id. at 1354 (citations and internal marks omitted).  Here, the

government concedes that Ramos asserted "his constitutional right to a Speedy

Trial," [Doc. 550 at 19], and this factor therefore weighs heavily in Ramos' favor.

D.   **Actual Prejudice**

"If, as here, the first three factors do not weigh heavily against the government, the defendant generally must demonstrate actual prejudice to succeed on his speedy trial claim."  Villarreal, 613 F.3d at 1355 (citation omitted). The Court assesses "the prejudice suffered by the defendant in light of the three interests of the defendant the speedy trial right was intended to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired."  Id. (citation and internal marks omitted).  Of these three interests, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  Id. (citation and internal marks omitted). The Court "remain[s] mindful that the passage of time makes it more difficult to demonstrate actual prejudice with complete precision."  Id. at 1356 (citations omitted).

Ramos asserts that "his ability to mount a defense has [] been prejudiced by the extraordinary delay."  [Doc. 541 at 21].  Ramos points to the fact that any witnesses will have "difficulty now recalling events that took place over 13 years ago," and he "himself will likely struggle to recall in detail his own actions from that long ago and will not be able to testify in his own defense as persuasively as

he could have had he been called to face these charges when his codefendants did." [Id. at 21-22]. Additionally, Ramos contends that "he has long since lost the cell phone he would have been using at that time," which could have been "used not only to document who he was communicating with and the content of those communications, which would likely be useful to minimize any role he played in the alleged conduct," but he also "could have subpoenaed historical cell site data from his service provider to demonstrate exactly where he was and when." [Id. at 22]. Ramos adds that "the delay in this case has given the government a tactical advantage, as every other defendant has now been convicted and all were sentenced to lengthy terms and therefore all now have an incentive to cooperate with the government against [] Ramos in the hopes of reducing their sentences." [Id.].

The government contends that Ramos cannot show actual prejudice, asserting that Ramos "made no showing at the evidentiary hearing as to any prejudice he might suffer and instead his lawyer now asserts points such as Ramos 'likely' will have trouble remembering event details and has lost his cell phone." [Doc. 550 at 19-20 (citation omitted)]. The government argues that Ramos' "pretrial incarceration has been minimal considering that he spent almost all of the decade between indictment and arrest outside of custody as a fugitive." [Id.

at 20].   Additionally, the government asserts that it is just as likely "that the government has lost cooperators since many of those that had cooperated at trial have completed their sentences and been deported if not a United States citizen," and therefore "there is nothing encourage[ing] these individuals to testify truthfully about Ramos'[] conduct."  [Id. at 20-21 (footnote omitted)].

In his reply, Ramos argues that "[m]ost of the witnesses the government points to are only tangentially tied to [his] aspect of the conspiracy, [] and the key players in the conspiracy allegedly involving him are serving very lengthy sentences and [thus] have every reason to cooperate for Rule 35 credit."  [Doc. 551 at 7 (citations omitted)].  Ramos points out that "the very codefendant who led the government to [] Ramos in the first place is only a year and a half into a 26-year sentence."  [Id. (citation omitted)].  Ramos concludes that "although [he ] is not required to show prejudice because all of the relevant factors weigh in his favor, the delay will most certainly prejudice his ability to defend this case."  [Id.].

"As to the first interest, [preventing pretrial incarceration,] [Ramos] was not incarcerated during the [ten] years between indictment and arrest."  United States v. Neda, 710 F. App'x 807, 813 (11th Cir. 2017) (per curiam) (unpublished).  "As regards the second, [minimizing the accused's anxiety and concern,] he does not allege that he suffered anxiety or concern (indeed, his argument necessarily rests

on the premise that he was unaware [of the indictment against him)]." Id.  The "focus, then, will be on the third interest: the potential impairment of [Ramos'] defense." Id.

Ramos has not shown that his "ability to present a defense has been hindered." United States v. Bell, 546 F. Supp. 3d 1136, 1144 (S.D. Fla. 2021).  The Eleventh Circuit "has consistently held that conclusory assertions of prejudice, including unsubstantiated allegations of witnesses' faded memories, are insufficient to constitute proof of actual prejudice." United States v. Hayes, 40 F.3d 362, 366 (11th Cir. 1994) (citations omitted); see also United States v. Philippe, CASE NO. 05-20874-CR-ALTONAGA, 2017 WL 1035518, at *7 (S.D. Fla. Mar. 17, 2017) (citation omitted); United States v. Gunn, Nos. 3:00cr48/LC/CJK, 3:09cv129/LC/CJK, 2011 WL 3812655, at *7 (N.D. Fla. June 13, 2011) (citation omitted), adopted by 2011 WL 3812661, at *1 (N.D. Fla. Aug. 26, 2011).  While Ramos contends that any witnesses will have "difficulty now recalling events that took place over 13 years ago," and he "himself will likely struggle to recall in detail his own actions from that long ago and will not be able to testify in his own defense as persuasively as he could have had he been called to face these charges when his codefendants did," [Doc. 541 at 21-22], "[o]ne of the very purposes of cross-examination being to expose the fallibility of memory, [Ramos] must show more

34

than the sort of ordinary forgetfulness that would have attended his trial had he been prosecuted in strict accordance with speedy trial procedures," Gunn, 2011 WL 3812655, at *8 (citations omitted).  Ramos' "conclusory allegations of prejudice due to . . . the diminished or distorted recollections of the witnesses who are still available[] are far too speculative to merit consideration."  Grajales-Lemos, 2012 WL 1405712, at *5 (citation omitted); see also United States v. Holland, CRIMINAL CASE NO. 1:17-cr-00234-AT-CMS, 2018 WL 8838858, at *16 (N.D. Ga. July 27, 2018) (citation omitted) (finding that the defendant's "claims of general prejudice from faded memories and the inability of several witnesses . . . to recall specific details due to the passage of time" were "general conclusory allegations" that "fail[ed] to satisfy the burden of showing actual prejudice"), adopted by 396 F. Supp. 3d 1210, 1249 (N.D. Ga. 2019); Gunn, 2011 WL 3812655, at *8 (citation omitted) (finding "the relation between defendant's allegations of impaired memory and the material facts in issue too tenuous to be recognized as a source of prejudice").

Additionally, Ramos failed to demonstrate at the hearing that he has been unable to "subpoena[] historical cell site data from his service provider to demonstrate exactly where he was and when," or point to any other attempts he made to obtain such data.  [Doc. 541 at 22]; see also Villarreal, 613 F.3d at 1356-57 (acknowledging that "neither [defendant] nor his counsel took any [] steps to

locate [] purportedly exculpatory documents, such as contacting the cell phone [company]"); United States v. Aleman, CRIMINAL ACTION NO. 1:08-CR-223-2-WSD-CMS, 2017 WL 1950363, at *10 (N.D. Ga. Jan. 17, 2017) (citations omitted) (finding the defendant "provide[d] no specifics in support of [his] assertion" that he was "unable to locate documentary evidence to support his alibi defense due to the passage of time," and the defendant "failed to show what steps were taken to locate documents that [did] exist"), adopted by 2017 WL 816174, at *9 (N.D. Ga. Mar. 2, 2017), aff'd, 723 F. App'x 817 (11th Cir. 2018) (per curiam) (unpublished). Regarding his lost cell phone, [Doc. 541 at 22], Ramos "has presented no evidence that this fact would have been any different if the trial had occurred sooner," Aleman, 2017 WL 1950363, at *9; see also United States v. Vigille, Case No. 04-60317-Cr-Hurley/Vitunac, 2006 WL 8448501, at *6 (S.D. Fla. Aug. 8, 2006) (finding that the defendant "merely made a conclusory allegation concerning prejudice" where he alleged he "was having trouble locating transcripts from" a 2002 suppression hearing, but "made no connection between the [g]overnment's delay in arrest and his current inability to secure the transcripts," and stating that "[t]he transcripts may have been missing before he was even indicted in" 2004), adopted by 2006 WL 8448499, at *1 (S.D. Fla. Sept. 7, 2006), aff'd, 301 F. App'x 919 (11th Cir. 2008) (per curiam) (unpublished). "Thus, [Ramos] has failed to show that the

delay resulted in specific prejudice to his defense." Aleman, 2017 WL 1950363, at*10. The fourth factor therefore weighs in the government's favor, and Ramos' motion to dismiss the indictment, [Doc. 529], as amended, [Doc. 541], is due to be denied.

## III.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Ramos' pending motion to dismiss the indictment, [Doc. 529], as amended, [Doc. 541], be **DENIED**.

There are no other motions pending before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of the trial. Accordingly, **IT IS ORDERED** and **ADJUDGED** that this action be, and the same is hereby, declared **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED** and **RECOMMENDED** this 9th day of March, 2023.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE